# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | |
|---|---|
| **CHARLIE M. SMITH, JR.,** ) | |
| Plaintiff, ) | Case No. 1:09cv00019 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| **MICHAEL ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| Defendant. ) | By: GLEN M. WILLIAMS |
| ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

The plaintiff, Charlie M. Smith, Jr., filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"). *See* 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

application of the correct legal standards.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'"  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Smith protectively filed his applications for DIB and SSI on February 8, 2007, alleging disability as of November 25, 2006, due to injuries resulting from a motor vehicle accident.  (Record, ("R."), at 117-32, 134, 141.)  The claims were denied initially and upon reconsideration.  (R. at 78-97, 409-14.)  Smith then requested a hearing before an administrative law judge, ("ALJ").  (R. at 111-12.)  A hearing was held on April 16, 2008, at which Smith testified and was represented by counsel.  (R. at 54-77.)

By decision dated July 16, 2008, the ALJ denied Smith's claims.  (R. at 14-23.)  The ALJ found that Smith met the disability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 16.)  The ALJ also found that Smith had not engaged in substantial gainful activity since the alleged onset of disability on November 25, 2006.  (R. at 16.)  The ALJ determined that the medical evidence established that Smith suffered from severe impairments, namely status-post left hip fracture with dislocation with open reduction internal fixation, lacerations of the bilateral knees with stitches and depression.  (R. at 16.)  However, the ALJ failed to

find that Smith had any impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) Additionally, the ALJ found that Smith had the residual functional capacity to perform light work[1] with certain limitations. (R. at 18.) The ALJ determined that Smith could only stand for two hours in a typical eight-hour workday, walk for two hours out in a typical eight-hour workday, sit for six hours in a typical eight-hour workday, and he also found that Smith was limited to occasional climbing, balancing, kneeling, crawling, stooping, and crouching, as well as precluded from working around hazardous machinery, unprotected heights or climbing ropes, ladders, scaffolding or working on vibrating surfaces. (R. at 18.) The ALJ further found that Smith was limited to simple, routine, repetitive and unskilled work. (R. at 18.) The ALJ indicated that Smith was unable to perform any of his past relevant work. (R. at 22.) Based on Smith's age, education, work experience and residual functional capacity, as well as the testimony of a vocational expert, the ALJ determined that there were a significant number of jobs existing in the regional and national economies the claimant could perform. (R. at 22.) These occupations included a file clerk/addresser, a non-emergency dispatcher and a product grader/sorter. (R. at 23.) Therefore, the ALJ concluded that Smith was "not disabled" as defined in the Act and was not entitled to benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

After the ALJ issued the decision, Smith pursued his administrative appeals, (R. at 415-26), but the Appeals Council denied his request for review. (R. at 6-9.) Smith then filed this action seeking review of the ALJ's unfavorable decision, which

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). This case is now before the court on Smith's motion for summary judgment, which was filed on June 18, 2009, and on the Commissioner's motion for summary judgment, which was filed on July 17, 2009.

## II. Facts

Smith was born in 1976, (R. at 117, 125), which classifies him as a "younger age" under 20 C.F.R. §§ 404.1563(e), 416.963(e). He received his general equivalency development diploma, ("GED"), (R. at 139), and has past work experience as a truck driver, a general factory laborer, a cook and a saw mill worker. (R. at 135, 153-60.)

At the April 16, 2008, ALJ hearing, Smith testified that he last worked in either February or November 2006, noting that he was last employed as a truck driver. (R. at 59.) He indicated that he was involved in an automobile accident unrelated to his employment, which rendered him unable to work. (R. at 59.) Smith further testified that he worked six or seven years as a general laborer, (R. at 59), stating that the jobs required him to lift 50 to 100 or more pounds. (R. at 60.)

Smith claimed that he could only sit for approximately 20 to 30 minutes at a time, explaining that sitting caused pain in his hips and legs. (R. at 60.) He acknowledged that he had suffered a hip fracture in the past, and he stated that he could only walk for about two blocks before being forced to stop and rest. (R. at 60.) He testified that he could stand for 20 minutes at a time "if [he was] lucky." (R. at

60.)  Smith also testified that he could only lift 10 to 15 pounds.  (R. at 61.)  He explained that, since his accident, he required the use of a cane.  (R. at 61.)  Smith noted that he took medications such as Percocet and Lyrica to treat his pain, reporting drowsiness as a side effect.  (R. at 61.)  He testified that nothing else relieved the pain, claiming that he was unable to lie down and sleep.  (R. at 61.)  Smith also reported sleep difficulties, anger issues and depression.  (R. at 61-62.)  He testified that he had been prescribed Lexapro to treat his depression.  (R. at 62.)

Smith stated that he normally slept until 8:00 a.m., at which point he would move to his couch to sleep and watch television.  (R. at 63.)  He stated that he typically slept two to four hours per night.  (R. at 63.)  Smith testified that he did not perform any household chores, but acknowledged that he had no problems using his hands.  (R. at 64.)  According to Smith, he was required to use a walker for ambulation from the time of his accident until April or May of 2007.  (R. at 64.)  He testified that he no longer used the walker, noting that he now used just a cane.  (R. at 64.)  Smith also explained that he did not assist with grocery shopping.  (R. at 65.)  He testified that he was able to drive, but noted that he could not take long trips.  (R. at 65.)  Smith acknowledged that he had driven to the hearing and estimated that he drove approximately 40 miles per week.  (R. at 65.)

Upon questioning from counsel, Smith stated that between the hours of 8:00 a.m. and 5:00 p.m. he spent two to three hours resting or lying down.  (R. at 66.)  He testified that he used this time to rest his leg and hip, and he also indicated that it allowed him to "get [his] mind off of stuff."  (R. at 66.)  Smith stated that he was often discouraged, which made him feel useless.  (R. at 66.)  He further indicated that these

feelings impacted his relationships with family and friends, noting that he did not enjoy being around them as often. (R. at 66.) He said that he did not like to talk and that he was unable to do anything, which caused him to stay at home. (R. at 66.) Smith also testified that he became upset more easily than he used to, stating that he had to "be alone so [he would not] do [anything] that [he would] regret." (R. at 67.) Smith said that he no longer had as many hobbies or interests as he once did, such as hunting, fishing, camping and certain social activities. (R. at 67-68.) He also reported that his ability to concentrate had diminished. (R. at 68.) At this point in the hearing, Smith's counsel noted that he had arranged for Smith to see a psychologist on April 28, 2008. (R. at 68.)

Leah Salyers, a vocational expert, also testified at Smith's hearing. (R. at 69-75.) Salyers identified Smith's past work as a truck driver as medium[2] and semi-skilled work, his work as a sawmill laborer as medium and unskilled, his brief employment as a restaurant cook as light and semi-skilled and his work as a factory laborer as heavy[3] and unskilled. (R. at 70.) Salyers was asked to consider an individual such as Smith who retained the residual functional capacity to perform work that required the following: lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and walking for two hours in a typical eight-hour workday; sitting for six hours in a typical eight-hour workday; a limited ability to

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(b) (2009).

[3]Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If an individual can perform heavy work, he also can perform sedentary, light and medium work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2009).

push and pull in the lower extremity; occasional climbing, balancing, kneeling, crawling, stooping and crouching; work that did not require working around hazardous machinery, unprotected heights, climbing ladders, ropes and scaffolds, or working on vibrating surfaces. (R. at 70-71.) The ALJ noted that such an individual would also be limited to simple, routine, repetitive and unskilled work. (R. at 71.) Based upon these limitations, Salyers was asked if such an individual would be able to perform Smith's past work as he performed it, or as it was customarily performed in the national economy, to which Salyers responded negatively. (R. at 71.)

The ALJ then asked Salyers to consider a second hypothetical. (R. at 71.) The ALJ specifically noted that Smith was a younger person with a GED, and that, given his age, education and past work experience, in addition to the previously mentioned limitations, he asked Salyers whether there would be jobs in either the regional or national economy that such an individual could perform. (R. at 71.) Salyers explained that such an individual would be able to perform sedentary work, such as unskilled clerical work as an addressor, a labeler or a file compiler, or other sedentary occupations such as a non-emergency dispatcher, a product grader, sorter and selector. (R. at 71-72.) Next, the ALJ asked Salyers to consider Exhibit 13F,[4] and to assume that the exhibit was supported by objective medical evidence of record and that the evidence was without significant contradiction. (R. at 72.) The ALJ asked if a hypothetical person with the limitations set forth in Exhibit 13F would be able to perform Smith's past work as he performed it, or as it was customarily performed in the national economy. (R. at 72.) Saylers opined that such an individual would not

---

[4]Exhibit 13F is a Medical Assessment Of Ability To Do Work-Related Activities (Physical) that was completed by Dr. Robert M. Harris, M.D., on April 14, 2008. (R. at 368-70.)

be able to perform Smith's past relevant work, noting that the profile would be less than an eight-hour workday and that the postural restrictions and estimation of absenteeism would preclude all work.  (R. at 72.)

In a fourth hypothetical, the ALJ asked Salyers to consider Smith's age, education and past work experience, as well as the limitations referenced in the third hypothetical.  (R. at 73.)  Based upon such limitations, Salyers stated that there would be no jobs in the regional or national economies that such a person could perform.  (R. at 73.)  Salyers then testified that her testimony was consistent with the Dictionary of Occupational Titles.  (R. at 73.)

Saylers was then questioned by Smith's counsel, who asked her to consider an individual of Smith's same age, education and work history who suffered from the limitations set forth in the medical assessment performed by Dr. Dwight Bailey, M.D. (R. at 73.)  Saylers testified that there would be no work that such an individual could perform since the amount of time without interruption of 10 minutes and 15 minutes suggested a person always in motion.  (R. at 73-74.)  Smith's counsel then asked Salyers to consider the limitations set forth in Exhibit 9F,[5] which indicated certain mental impairments.  (R. at 74.)  Saylers noted that such limitations were listed as poor and that the limitations would prevent a person from sustaining gainful employment.  (R. at 75.)  Smith's counsel then asked Saylers to assume that the ALJ accepted Smith's testimony as to his limitations as credible.  (R. at 75.)  Based on Smith's testimony, counsel asked Saylers how such limitations would impact the

        [5]Exhibit 9F is a medical expert report and Medical Source Statement Of Ability To Do Work-Related Activities (Mental) completed by William B. Haynes, M.Ed., on April 10, 2008. (R. at 357-59.)

potential job market. (R. at 75.) Saylers testified that there would be no competitive labor that could be performed or sustained under those circumstances. (R. at 75.) The ALJ noted that the record would remain open until May 28, 2008, to allow Smith's counsel to submit the results of the scheduled psychological appointment. (R. at 76.)

In rendering her decision, the ALJ reviewed medical records from Wellmont Holston Valley Medical Center; Smyth County Community Hospital; Francis Marion Manor; Regional Orthopedic Trauma Associates; Home Nursing Company, Inc.; Sherry Miller, FNP; Lebanon Physical Therapy & Rehabilitative Services; Dr. Robert M. Harris, M.D.; Dr. Robert Clampitt, M.D.; Dr. Dwight L. Bailey, M.D.; Dr. Michael Hartman, M.D., a state agency physician; Dr. Frank M. Johnson, M.D., a state agency physician; William B. Haynes, M.Ed.; and John W. Ludgate, Ph.D. Following the hearing, Smith's counsel also submitted additional records from William B. Haynes, M.Ed., and Dr. Dwight L. Bailey, M.D., to the Appeals Council.[6]

Smith was admitted to Wellmont Holston Valley Medical Center, ("WHVMC"), on November 25, 2006, due to injuries sustained in a motor vehicle accident. (R. at 203-54.) It was noted that Smith was involved in a head-on collision and he lost consciousness. (R. at 206.) Upon presenting to the hospital, Smith reported hip pain and vomiting. (R. at 206.) A nasogastric tube was placed and Smith's neurological status was normal. (R. at 206.) A physical examination showed

_____

[6]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Smith to be acutely injured, but he was awake and alert. (R. at 206.) Smith had some facial lacerations and abrasions, and he was able to talk and move all four extremities, except for the lower extremities that were in a splint. (R. at 206.) X-rays revealed a left hip dislocation, a possible acetabular fracture on the left side and a computerized axial tomography, ("CT"), scan of the head revealed a possible left frontal contusion. (R. at 207.) The clinical impression noted a closed head injury, left hip dislocation and an acetabular fracture. (R. at 207.) A reduction of the hip dislocation was performed, along with appropriate suturing of all lacerations. (R. at 207.) A CT scan of the neck was unremarkable. (R. at 208.) An operation on Smith's hip was ordered. (R. at 210.)

Hours following the accident and Smith's admittance to WHVMC, surgical procedures were performed on Smith, including irrigation and debridement of the right knee joint, with primary closure over a drain. (R. at 216-17.) Left knee irrigation and debridement of all nonviable skin, muscle and bone was performed, as well as a left open unicortical patellar fracture, unicortical defect/fracture and primary closure. (R. at 216.) The post-operative diagnosis noted a laceration over the right knee with extension into the joint, and a left knee superficial laceration with unicortical defect of the left patella. (R. at 216.) The post-operative plan indicated that Smith would be able to bear full weight on the right lower extremity and noted that they would wait five to seven days before beginning active range of motion of either knee. (R. at 217.) A closed reduction under anesthesia with manipulation also was performed due to the left hip fracture/dislocation with fracture of the posterior wall and femoral head. (R. at 214.)

Smith also underwent several CT scans and x-rays after the accident. An initial chest x-ray was normal, and a pelvis x-ray indicated a left hip posterior dislocation with a probable fracture of the femoral head and possibly of the posterior superior acetabulum, with multiple overlying foreign bodies. (R. at 229-30.) Smith underwent a CT scan of the head, which revealed findings that created suspicion for small intraparenchymal hemorrhage. (R. at 237.) A CT scan of the cervical spine showed no discrete acute cervical spine process. (R. at 238.) A CT scan of the chest with contrast indicated that there was no discrete acute process of the thorax, and a CT scan of the thoracic spine revealed no discrete fracture or subluxation. (R. at 239.) A CT scan of the lumbar spine without contrast showed no discrete fracture of the lumbar spine, and a CT scan of the abdomen and pelvis post-contrast showed no discrete acute intraabdominal or intrapelvic process. (R. at 240-41.) However, the scan did reveal a left hip superior posterior dislocation with avulsion of medial 1/3 to 1/4 of the femoral head. (R. at 241.) It was noted that a fragment was lodged within the joint space and there were multiple additional fracture fragments within the joint space as well. (R. at 241.) In particular, at least two fragments were located between the femoral and posterior acetabulum. (R. at 241.) X-rays of the knees returned normal findings. (R. at 234-35.) Fluoroscopic images of the left hip were taken, which revealed a fracture fragment around the lateral aspect of the roof of the acetabulum. (R. at 247.) There also was a large fracture fragment that was depressed, which was arising from the inferomedial aspect of the femoral head. (R. at 247.) It was noted that Smith could possibly benefit from a CT scan of the left hip in order to evaluate the femoral head fracture. (R. at 247.)

On November 26, 2006, a CT scan of the head without contrast was performed

and revealed a small area of hemorrhage or contusion at the high left frontal lobe, which had not significantly changed since the first CT scan. (R. at 245.) An x-ray of the chest was normal. (R. at 232.) Smith underwent a CT scan of the pelvis without contrast on November 27, 2006, which showed fractures of the left femoral head and superolateral margin of the acetabular rim. (R. at 243.) It was noted that the dislocation that was present on the November 25, 2008, CT scan of the pelvis had been reduced. (R. at 243.)

On November 28, 2006, Dr. Testerman administered the following procedures: the placement of a prophylactic tulip inferior vena cava filter; an ultrasound guidance was used to identify the right common femoral vein; and an inferior venacavagram. (R. at 249-51.) The pre-operative diagnosis noted pelvic fracture, bilateral lower extremity fracture and prolonged immobilized status. (R. at 249-50.) The procedures showed no evidence of thrombosis and Smith tolerated the procedures well. (R. at 250-51.) On November 29, 2006, Smith underwent a pelvic x-ray with fluoroscopy. (R. at 252.) Smith also had surgery performed, which included open reduction internal fixation of the acetabular fracture, posterior wall and of the femoral head fracture. (R. at 219-20.) The post-operative diagnosis noted left acetabular fracture with a femoral head fracture, and no complications were reported. (R. at 219-20.)

Smith was treated at Smyth County Community Hospital and Francis Marion Manor, where he was admitted to recover from the motor vehicle accident, and was treated by Dr. Robert Van Clampitt, M.D., from December 6, 2006, to January 2, 2007. (R. at 255-316.) During this time period, Smith steadily improved and was given pain medication to address leg, hip and pelvic pain. (R. at 255-316.) It was

noted that his wounds and injuries were healing.  (R. at 255-316.)  On December 28, 2006, treatment notes indicate that certain equipment would be needed upon his discharge, including a tub transfer bench, an elevated toilet seat with arms, a rolling walker and a hospital bed.  (R. at 295.)  Smith was discharged from Francis Marion Manor on January 2, 2007, and Dr. Clampitt ordered that he continue with home health care and that he would need a rolling walker and hospital bed upon his release.  (R. at 262.)

Smith was treated at Regional Orthopedic Trauma Associates from December 19, 2006, to June 6, 2007.  (R. at 317-23.)  On December 19, 2006, Smith was treated by Dr. Robert M. Harris, M.D., who noted that the incision was well healed over the left hip, left knee and right knee.  (R. at 323.)  The sutures were removed and the assessment indicated left Pipkin IV fracture dislocation.  (R. at 323.)  Dr. Harris indicated that Smith was to continue touchdown weight bearing for approximately nine weeks on the left lower extremity, and he noted that Smith could do range of motion of his upper extremities and right lower extremity, as well as range of motion of both knees.  (R. at 323.)  Smith returned on January 24, 2007, and saw a physician's assistant, at which time Smith reported that he had been doing well.  (R. at 322.)  Despite this statement, Smith also stated that he had been aching during the day, and he requested stronger pain medication.  (R. at 322.)  Smith also reported difficulties sleeping, but denied any other problems.  (R. at 322.)  It was noted that his incisions were healing well, x-rays demonstrated good hardware placement and his joint line was intact.  (R. at 322.)  Smith was directed to continue with his current therapy, and he was prescribed Lortab and Ambien.  (R. at 322.)  Smith was instructed to return in four weeks, at which time they planned to release him for ambulation and

to increase his therapy.  (R. at 322.)

Smith saw Dr. Harris on February 21, 2007, and the x-rays revealed left acetabular fracture and femoral head fracture with good alignment and good healing. (R. at 321.)  On May 23, 2007, Smith again saw Dr. Harris, at which time x-rays showed good anatomic reduction of the pelvis, as well as good maintenance of joint space of the left acetabulum.  (R. at 320.)  There was no evidence of avascular necrosis of the femoral head or neck.  (R. at 320.)  Smith reported that he had been doing "quite well," but he did express concern over some sensitivity on the left hip area. (R. at 319.)  He also reported some tenderness, but noted that it had not radiated down the leg or up into the side.  (R. at 319.)  Upon examination, he exhibited good range of motion in the lower extremity, but there was some tenderness over the bursa area of the greater troch of the left hip.  (R. at 319.)  The incision was well incorporated and intact with no discharge or drainage noted.  (R. at 319.)  Smith was advised to continue therapy, including strengthening of the quadriceps of his left lower extremity.  (R. at 319.)  Further testing also was ordered to check for bursitis in the left hip area.  (R. at 319.)  Smith was prescribed Percocet, but was instructed to "start stepping down" on the pain medication, as it was explained to him that the strength of the dosage would be steadily dropped with intentions to move him down to Lortab and eventually off narcotic medication.  (R. at 319.)  Smith presented on June 6, 2007, and requested a refill of his Percocet, which was granted, but the dosage was reduced and Smith was informed that he would need to either seek pain management or his family physician for further prescriptions.  (R. at 318.)

Smith was again treated by Dr. Harris on November 14, 2007.  (R. at 366-67.)

Dr. Harris completed a medical evaluation in which he determined that Smith was unable to participate in employment and training activities in any capacity at the time of the evaluation, noting that the duration of this limitation would last in excess of 60 days. (R. at 366.) Dr. Harris recommended that Smith apply for disability. (R. at 366.) He further found that Smith had a limited range of motion and mild nerve damage in the left leg. (R. at 367.) Treatment notes from this date show that Smith reported that he was "doing somewhat better." (R. at 371.) He continued to have a decreased range of motion and some nerve damage in the left lower extremity, as well as stiffness in the morning and evening. (R. at 371.) X-rays demonstrated no change in the position of the hardware, but he had some loss of joint space on the left side compared to the right. (R. at 371.) He was advised to continue with self-paced physical therapy. (R. at 371.)

Dr. Harris completed an Assessment Of Ability To Do Work-Related Activities (Physical) on April 14, 2008. (R. at 368-70.) Dr. Harris found that Smith could lift and/or carry items weighing a maximum of 20 pounds occasionally and items weighing a maximum of 10 pounds frequently. (R. at 368.) He further found that Smith could stand/walk for a total of one to three hours in a typical eight-hour workday, noting that Smith could stand/walk for less than one hour without interruption. (R. at 368.) Dr. Harris determined that Smith could sit for a total of two to four hours in a typical eight-hour workday, noting that he could sit for two hours without interruption. (R. at 369.) Dr. Harris indicated that Smith could occasionally climb, stoop, kneel and crawl, but that he could never balance or crouch. (R. at 369.) Smith was unlimited in his ability to reach, handle, feel, see, hear and speak, but he was found to be limited in his ability to push and/or pull. (R. at 369.) Dr. Harris

noted environmental limitations such as working around heights and moving machinery.  (R. at 370.)  Dr. Harris explained that Smith was developing post-traumatic arthritis in his left hip, which he claimed would require hip replacement in the future.  (R. at 370.)  Lastly, Dr. Harris opined that Smith's physical impairments would force him to miss more than two days per month of work.  (R. at 370.)

The record shows that Smith was treated by Home Nursing Company, Inc., from March 23, 2007, to April 10, 2007.  (R. at 323-27.)  During this time, Smith underwent physical therapy at home, and the care was discontinued on April 10, 2007.  (R. at 326.)

Smith was treated by Sherry Miller, FNP, and Dr. Dwight L. Bailey, M.D., from, February 28, 2007, to July 29, 2008.  (R. at 328-33, 375-96, 431-40.)  On February 28, 2007, Smith presented to Dr. Bailey for treatment of pain from the left hip to the foot.  (R. at 332-33.)  Smith rated his pain as a five or six on a ten-point scale.  (R. at 332.)  He complained of knee pain, lower left leg pain and swelling.  (R. at 332.)  The clinical assessment noted a closed fracture of the base of the neck of the femur, as well as fracture ischium closed.  (R. at 333.)  Smith presented to Miller on April 26, 2007, seeking treatment for left hip pain and bilateral knee pain.  (R. at 330-31.)  He rated his pain as a five on a ten-point scale.  (R. at 330.)  Smith reported joint pain, bilateral knee pain, left hip pain, joint stiffness, joint swelling, anxiety and sleep disturbance.  (R. at 330.)  Upon physical examination, he did not appear to be in acute distress, as the examination was unremarkable.  (R. at 330.)  The clinical assessment included insomnia and closed fracture of the base of the neck of the femur.  (R. at 331.)  Smith presented to Dr. Bailey on July 2, 2007, reporting similar problems, but

reported that his pain had increased to a rating of eight on a ten-point scale. (R. at 395-96.) The clinical assessment was unchanged, and he was advised to stop taking Lortab and was prescribed Percocet and Mobic. (R. at 395-96.)

Smith saw Miller on August 1, 2007, reporting left hip and bilateral knee pain. (R. at 393-94.) Smith was diagnosed with closed fracture of the base of the neck of the femur, insomnia and gastroesophageal reflux disease, ("GERD"), was instructed to continue taking Percocet and Lyrica and was prescribed Prilosec. (R. at 394.) Smith returned and saw Dr. Bailey on August 31, 2007, and complained of left hip fracture and bilateral knee pain, rating his pain as a five on a ten-point scale. (R. at 391-92.) Smith was advised to continue taking Percocet. (R. at 392.) On September 6, 2007, Smith saw Miller and reported knee and hip pain, and he also requested to have a form completed. (R. at 389-90.) He rated his pain as a six on a ten-point scale, and continued to complain of joint pain, bilateral knee pain, joint stiffness, joint swelling and lower back pain. (R. at 389.) Smith reported no anxiety, but did complain of sleep disturbances. (R. at 389.) The clinical assessment again included GERD, insomnia and close fracture of the base of the neck of the femur. (R. at 390.) Smith continued being routinely treated by Miller and Dr. Bailey from October 1, 2007, to March 26, 2008, complaining of the same symptoms and, during these visits, he rated his pain from five to eight on a 10-point scale. (R. at 375-88.) Smith's diagnoses remained virtually unchanged, but the assessments also noted pain in thoracic spine, depression and pain in his limb. (R. at 375-88.) During these visits, he was prescribed medications such as Percocet, Flexeril, Lexapro, Prilosec, Mobic, Lyrica, Skelaxin and Cataflam. (R. at 375-88.)

On April 10, 2008, Dr. Bailey completed an Assessment Of Ability To Do Work-Related Activities (Physical), finding that Smith could lift items weighing a maximum of five to 10 pounds occasionally. (R. at 372-74.) Dr. Bailey also found that Smith could stand/walk for a total of two hours in a typical eight-hour workday, but only for 10 minutes without interruption. (R. at 372.) He also determined that Smith could sit for a total of six hours in a typical eight-hour workday, noting that Smith could only sit for 15 minutes without interruption. (R. at 373.) Dr. Bailey found that Smith could never climb, stoop, kneel, balance, crouch or crawl and that Smith was limited in his ability to push and/or pull. (R. at 373.) No limitations were noted as to Smith's ability to reach, handle, feel, see, hear or speak. (R. at 373.) Dr. Bailey found that Smith would suffer from certain environmental limitations, such as working around heights, moving machinery, temperature extremes, chemicals, dust, humidity and vibration. (R. at 374.) Dr. Bailey concluded that Smith was unable to work. (R. at 374.)

Smith continued to seek treatment from Dr. Bailey and Miller from April 23, 2008, to July 29, 2008. (R. at 431-40.) Smith continued to report left hip pain, bilateral knee pain, lower back pain, leg pain and swelling. (R. at 431-40.) His diagnoses were again noted as closed fracture of the base of the neck of the femur, fracture ischium closed, thoracic spine pain and pain in his limb. (R. at 431-40.) During these visits, Smith was prescribed Percocet, Prilosec and Avinza. (R. at 431-40.)

Smith was treated a Lebanon Physical Therapy & Rehabilitative Services from April 26, 2007, to June 28, 2007. (R. at 334-49.) Smith presented on April 26, 2007,

for physical therapy to address the left acetabular fracture and the left femoral head fracture. (R. at 347-49.) It was noted that Smith used a cane to ambulate, but that he had a tendency to use the cane on the wrong side. (R. at 347.) Smith's patellar mobility was slightly decreased medially and laterally to the bilateral patella, minimally, inferiorly and superiorly. (R. at 347.) He was observed to ambulate with an obvious Trendelenburg gait pattern with decreased strength to the lateral hip musculature. (R. at 347.) Smith had a decreased range of motion of his left greater than his right hip, and he had knee flexion contracture. (R. at 348.) Smith also exhibited decreased strength of his hips and bilateral knees, as well as resulting difficulty with his function. (R. at 348.) Smith's short-term goals included: (1) decrease pain to the left hip to minimal; (2) increase hip range of motion by 10 degrees in all planes; (3) increase strength by 0.5 of a muscle grade in all planes, left hip and knee; and (4) for Smith to ambulate with a non-antalgic gait pattern using a straight cane. (R. at 348.) Long-term goals were identified as follows: (1) decrease pain to the hip with activity to minimal to none; (2) increase active range of motion of the right and left hips to within normal limits; (3) increase strength of the bilateral hips to greater than or equal to 4/5; (4) for Smith to be able to ambulate with a non-antalgic pattern on unlevel surfaces with minimal to no difficulty; and (5) return him to the highest function possible in the shortest time possible. (R. at 349.) Treatment was not initiated on this particular date because Smith indicated that he did not have time. (R. at 349.) He arrived one hour late to his appointment. (R. at 349.)

Smith presented for physical therapy on May 1, 2007, and reported no complaints following his initial physical therapy evaluation. (R. at 345.) Smith continued to complain of soreness and stiffness in his left hip, which extended into his

left thigh.  (R. at 345.)  At this visit, Smith underwent aquatic therapy and therapeutic exercises.  (R. at 345.)  He was given instructions regarding a home exercise program aimed at left lower extremity strengthening.  (R. at 345.)  Smith tolerated the therapy well and was encouraged to continue the home exercise program.  (R. at 345.)  Smith returned on May 3, 2007, and he continued with the same therapy, in addition to some new exercises for lower extremity strengthening.  (R. at 344.)  It was noted that Smith had improved with respect to his overall strength, as well as his range of motion and endurance.  (R. at 344.)  Smith continued physical therapy from May 15, 2007, to June 28, 2007, where he continued with the therapy and exercises mentioned above, as well as additional exercises intended to improve his strength, range of motion and gait pattern.  (R. at 334-43.)  On more than one occasion, the treatment notes indicate that Smith put forth a consistent effort, was well motivated and compliant.  (R. at 335, 342-43.)  On May 31, 2007, Smith did not report any significant amount of pain, and on June 5, 2007, he reported that he was doing "ok" with no complaints.  (R. at 337-38.)  On June 12, 2007, Smith reported that, when at home, he had been ambulating mostly without the use of his cane.  (R. at 336.)

Dr. Michael Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on March 23, 2007.  (R. at 350-56.)  Dr. Hartman found that Smith could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of at least two to three hours in a typical eight-hour workday, sit for a total of six hours in a typical eight-hour workday, and he noted that Smith was moderately limited in his ability to push and/or pull with his left lower extremity.  (R. at 351.)  Dr. Hartman further found that Smith was limited to occasional climbing,

balancing, stooping, kneeling, crouching and crawling. (R. at 352.) No manipulative, visual or communicative limitations were noted. (R. at 352-53.) As for environmental limitations, Dr. Hartman determined that Smith should avoid even moderate exposure to hazards such as machinery and heights. (R. at 353.) Dr. Hartman acknowledged that the findings of the treating/examining sources were significantly different from his findings. (R. at 354.) Dr. Hartman found Smith's allegations to be only partially credible. (R. at 356.) Dr. Frank M. Johnson, M.D., a state agency physician, reviewed and affirmed Dr. Hartman's findings on August 16, 2007. (R. at 354.)

Smith sought psychological treatment from William B. Haynes, M.Ed., from November 27, 2007, to February 26, 2008. (R. at 360-63.) Smith presented to Haynes on November 27, 2007, by referral from his counsel. (R. at 363.) Smith reported daily chronic pain secondary to his hip problem. (R. at 363.) He described the pain as rough, throbbing, stabbing, burning and aching. (R. at 363.) Smith also reported sleep difficulties, noting that lying in bed caused pain that often disrupted his sleep. (R. at 363.) Haynes noted that Smith walked with a cane, but indicated that he could walk short distances without the cane. (R. at 363.) For example, Smith stated that he could walk across his living room to the kitchen, noting that he walked with a heavy limp when not using his cane. (R. at 363.) Smith complained of feelings of anger and hostility, which he often took out on his family. (R. at 363.) Haynes noted that Smith had a poor appetite, but that he managed to gain weight. (R. at 363.) Smith informed Haynes that he experienced feelings of guilt, blaming himself for being unable to provide for his family. (R. at 363.) Smith claimed that he had back pain before his motor vehicle accident, but stated that it had worsened. (R. at 363.) Smith denied

suicidal thoughts.  (R. at 363.)  Haynes's psychological assessment indicated that Smith was a depressed individual, secondary to his chronic pain, that was unable to work, who experienced chronically disrupted sleep due to pain and who had intense financial pressure and guilt over his belief that he could not provide for his family. (R. at 363.)  Haynes recommended that Smith discuss with Dr. Bailey the need to add an antidepressant to his treatment regimen in order to lift his mood and energy level to bolster his ability to cope with pain.  (R. at 363.)  Smith was diagnosed with major depression, a fractured and reconstructed hip and pelvis, chronic pain, financial pressure, inability to work and a then-current Global Assessment of Functioning, ("GAF"), score of 62.[7]

Smith presented to Haynes again on December 20, 2007, with a chief complaint of depression, which was secondary to his past motor vehicle accident and chronic pain.  (R. at 362.)  It was noted that Smith was started on Lexapro two weeks prior to this particular visit.  (R. at 362.)  He reported side effects such as nausea and jitteriness.  (R. at 362.)  Smith noticed no improvements in his mood, energy, emotions or outlook.  (R. at 362.)  Smith also reported continued sleep difficulties due to pain, discomfort and "thinking too much."  (R. at 362.)  He indicated that his pain level was unchanged, stating that the pain was localized in his left hip, left leg and both knees.  (R. at 362.)  Smith further explained that he experienced tension and tightness in his neck and shoulder muscles, which he felt was a side effect of Lexapro.

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF score of 61-70 indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

(R. at 362.)  He claimed that he could walk no more than 10 to 15 minutes before having to stop.  (R. at 362.)  Smith also reported that he was forced to take frequent breaks between tasks, but explained that he was unable to perform any household chores or activities.  (R. at 362.)  Haynes noted that Smith's mood remained very low and his motivation was poor.  (R. at 362.)  Smith displayed a disinterest in life and it was observed that he experienced very little hedonic capacity.  (R. at 362.)  Haynes found Smith's somatic focus to be very high, and he noted that Smith had few interests or outlets to serve as positive motivators or positive distractors.  (R. at 362.)  It also was noted that Smith's then-current medications included Percocet, Lexapro and Lyrica.  (R. at 362.)  Haynes again diagnosed Smith with major depression.  (R. at 362.)  Haynes indicated that he worked with Smith on the idea of establishing goal-oriented challenges and interests to improve his sense of worth and purpose in life.  (R. at 362.)  Haynes specifically wanted Smith to learn to emphasize relational and people goals rather than physical end labor goals.  (R. at 362.)

Smith again saw Haynes for treatment on January 29, 2008.  (R. at 361.)  His chief complaint was depression secondary to chronic pain.  (R. at 361.)  Smith again reported sleep difficulties, depression, poor appetite and lack of energy or interest in routine activities.  (R. at 361.)  Smith's affect was very flat and he was primarily unresponsive emotionally to a wide variety of topics and issues.  (R. at 361.)  He denied suicidal thoughts, anger or bitterness over his accident, and he exhibited anxious feelings about the future.  (R. at 361.)  Smith indicated that he missed working.  (R. at 361.)  Haynes encouraged Smith to speak with his treating physician regarding the possibility of increasing his Lexapro dosage.  (R. at 361.)  He was diagnosed with major depression, secondary to chronic pain.  (R. at 361.)  Smith

presented to Haynes on February 26, 2008, again complaining of depression secondary to chronic pain. (R. at 360.) Smith's symptoms and complaints remained the same, and Haynes noted that Smith was highly depressed, discouraged and dysthymic. (R. at 360.) Haynes again noted a diagnosis of major depression. (R. at 360.)

On April 10, 2008, Haynes completed an Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 357-59.) In evaluating Smith, Haynes made the following findings: good ability to follow work rules; fair ability to relate to co-workers, use judgment with the public, interact with supervisors, understand, remember and carry out simple job instructions and maintain personal appearance; poor ability to deal with the public, deal with work stresses, function independently, maintain attention and concentration, understand, remember and carry out detailed and complex job instructions, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 357-58.) Haynes found that Smith was capable of managing his benefits in his best interest, and he opined that Smith would miss more than two days of work per month due to his impairments. (R. at 359.)

Smith presented to Haynes on May 20, 2008, with symptoms of depression, secondary to chronic pain and loss of ability to work. (R. at 429.) Smith continued to report symptoms similar to those noted in his previous visits. (R. at 429.) He described his pain as "more constant" than it used to be, and he noted that he had started to experience pain during wet or cool weather. (R. at 429.) Haynes reported that Smith's mood remained low, negative and cynical. (R. at 429.) It also was noted

that Smith was having trouble seeing improvement in his life due to his depression, and he continued to experience daily pain that limited him greatly.  (R. at 429.) Haynes indicated that they continued to work on enhancing Smith's daily life through reasonable and minor activities, such as fishing and camping with his sons.  (R. at 429.)  Haynes again noted a diagnosis of major depression.  (R. at 429.)

John W. Ludgate, Ph.D., completed a psychological evaluation on April 28, 2008.  (R. at 397-408.)  Ludgate noted depression, anxiety and irritability, which stemmed from the motor vehicle accident.  (R. at 398.)  Ludgate also noted that Smith was "very pleasant and cooperative," but appeared to be clinically depressed and in "obvious pain."  (R. at 398.)  During this visit, Smith rated his pain as a seven on a 10-point scale. (R. at 398.) Mr. Ludgate  administered a Structure Clinical Interview for Diagnosis, ("SCID"), and the Minnesota Multiphasic Personality Inventory, ("MMPI"),  during this session.  (R. at 401.)  On the SCID, Ludgate stated Smith met the criteria for major depression, single episode because of his sadness, loss of interest and pleasure, sleep disturbance, energy loss, sense of worthlessness and hopelessness. (R. at 401.)  Ludgate also mentioned Smith's concentration problems, social withdrawal, hopelessness about the future and suicidal thoughts as evidence of that diagnosis.  (R. at 401.)  Ludgate explained that Smith suffered from a mood disorder due to a medical condition because there was a clear causal connection between his medical and physical problems and the onset of his mood disturbance.  (R. at 401.) Ludgate further explained that Smith suffered from symptoms of generalized anxiety disorder such as nervousness, tenseness, worry, apprehension, physical restlessness, palpitations, significant irritability and tremulousness. (R. at 401.) Ludgate noted that Smith avoided large stores and social situations. (R. at 401.)

The MMPI revealed clinically significant scores in depression, somatization and psychasthenia (anxiety). (R. at 401-02.) Ludgate indicated that the profile showed an individual troubled by depression, apprehension, worry and irritability, with a low frustration tolerance and a tendency to have somatic flare-ups when stressed. (R. at 402.) Ludgate explained that such an individual would be socially withdrawn, with poor self-esteem, feelings of guilt and would be impaired by concerns about physical health. (R. at 402.) The examination also showed evidence of significant and incapacitating depression, demoralization and anxiety about the future, as well as problems with resentment and anger. (R. at 402.) Ludgate opined that Smith's profile was significant for moderate to severe clinical psychopathology and indicated someone that was significantly impaired psychiatrically. (R. at 402.) Ludgate opined that Smith was at risk for malingering as measured by the Structured Interview of Malingering Symptomatology, ("SIMS"). (R. at 402.) The Beck Depression Inventory and the Beck Anxiety Inventory showed moderate to severe levels of clinical depression and anxiety. (R. at 402.)

Ludgate diagnosed Smith with major depression, a mood disorder due to a medical condition and generalized anxiety disorder. (R. at 403.) Ludgate opined that Smith's psychiatric and medical problems precluded him from working at the time of the evaluation. (R. at 403.) He specifically noted that Smith was "obviously unable to return to his former occupation as a truck driver." (R. at 403.) Ludgate explained that physical work would not be within his range of capability at the time of the evaluation or in the future. (R. at 403.) Ludgate also cited problems such as Smith's educational background, inability to sit for extended periods, mood disturbance and low frustration tolerance that would all make it difficult for him to work around

people.  (R. at 403.)  Lastly, Ludgate opined that Smith was likely to require continued counseling and psychotropic medication to deal with his problems.  (R. at 403.)

On May 13, 2008, Ludgate completed an Assessment Of Ability To Do Work-Related Activities (Mental).  (R. at 404-07.)  Ludgate determined that Smith had a good ability to maintain personal appearance.  (R. at 406.)  He also determined that Smith had a fair ability to follow work rules, use judgment with the public, understand, remember and carry out simple job instructions and demonstrate reliability.  (R. at 404-06.)  Ludgate found Smith had a poor ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, understand remember and carry out detailed and complex job instructions, behave in an emotionally stable manner and relate predictably in social situations.  (R. at 404-06.)  It was noted that Smith was capable of managing his benefits in his own best interest.  (R. at 407.)  Ludgate opined that Smith would be absent from work more than two days per month.  (R. at 407.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if

not, whether he can perform other work. *See* C.F.R. §§ 404.1520, 416.920 (2009). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated July 16, 2008, the ALJ denied Smith's claims. (R. at 14-23.) The ALJ found that Smith met the disability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 16.) The ALJ also found that Smith had not engaged in substantial gainful activity since the alleged onset of disability on November 25, 2006. (R. at 16.) The ALJ determined that the medical evidence established that Smith suffered from severe impairments, namely status-post left hip fracture with dislocation with open reduction internal fixation, lacerations of the bilateral knees with stitches and depression. (R. at 16.) However, the ALJ failed to find that Smith had any impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.)

Additionally, the ALJ found that Smith had the residual functional capacity to perform light work[8] with certain limitations. (R. at 18.) The ALJ determined that Smith could only stand for two hours in a typical eight-hour workday, walk for two hours out in a typical eight-hour workday, sit for six hours in a typical eight-hour workday, and he also found that Smith was limited to occasional climbing, balancing, kneeling, crawling, stooping, and crouching, as well as precluded from working around hazardous machinery, unprotected heights or climbing ropes, ladders, scaffolding or working on vibrating surfaces. (R. at 18.) The ALJ further found that Smith was limited to simple, routine, repetitive and unskilled work. (R. at 18.) The ALJ indicated that Smith was unable to perform any of his past relevant work. (R. at 22.) Based on Smith's age, education, work experience and residual functional capacity, as well as the testimony of a vocational expert, the ALJ determined that there were a significant number of jobs existing in the regional and national economies the claimant could perform. (R. at 22.) These occupations included a file clerk/addresser, a non-emergency dispatcher and a product grader/sorter. (R. at 23.) Therefore, the ALJ concluded that Smith was "not disabled" as defined in the Act and was not entitled to benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

Smith argues that the ALJ failed to give appropriate weight to the opinions of Smith's treating physicians, treating mental health source and the mental health examiner. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-11.) Smith also contends that the ALJ erred by improperly evaluating the mental impairments of record. (Plaintiff's Brief at 11-15.) Next, Smith

---

[8]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

argues that the ALJ failed to pose a proper hypothetical to the vocational expert. (R. at 15-16.) Lastly, based upon the arguments asserted, Smith argues that there is insufficient evidence to support the ALJ's decision. (Plaintiff's Brief at 16.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Smith's argument that the ALJ failed to give proper weight to the views of the treating sources. (Plaintiff's Brief at 5-11.) In particular, Smith argues that the opinions of Dr. Harris, Dr. Bailey, Haynes and Ludgate should have been given controlling weight. (Plaintiff's Brief at 5-11.)

The court notes that the ALJ is required to consider objective medical facts and the opinions and diagnoses of both treating and examining professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § § 404.1527(d)(2), 416.927(d)(2) (2009). However, despite this general rule, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[9] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. Furthermore, as stated above, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King*, 615 F.2d at 1020, an ALJ may, under the regulations, assign no or little weight to even the opinion of a treating source, based on the factors at 20 C.F.R. §§

---

[9]*Hunter* was superceded by 20 C.F.R. § 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings.

With these principles in mind, the undersigned notes that the ALJ was justified in not giving controlling weight to the opinions of Dr. Harris and Dr. Bailey. The record clearly shows that each treating physician had an established treatment history with Smith and that each physician made very restrictive findings, essentially concluding that Smith was unable to work. However, the record also contains the opinions of state agency physicians Dr. Hartman and Dr. Johnson, who determined that Smith could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of at least two to three hours in a typical eight-hour workday, sit for a total of six hours in a typical eight-hour workday, and that Smith was moderately limited in his ability to push and/or pull with his left lower extremity. (R. at 351.) Dr. Hartman and Dr. Johnson also found that Smith was limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling. (R. at 352.) No manipulative, visual or communicative limitations were noted. (R. at 352-53.) As for environmental limitations, it was determined that Smith should avoid even moderate exposure to hazards such as machinery and heights. (R. at 353.) Thus, there is certainly evidence of record to support the ALJ's decision. In fact, the ALJ gave Smith the benefit of the doubt and placed more restrictive limitations on Smith's physical abilities than the state agency physicians. Therefore, I am of the opinion that the ALJ was justified in not give controlling weight to the opinions of Dr. Harris and Dr. Bailey, as her findings were not inconsistent with other substantial evidence of record. *See Craig*, 76 F.3d at 590.

As to Smith's alleged mental impairments, as noted by the Commissioner on brief, it can certainly be argued that the opinions expressed by Haynes and Ludgate may not rise to the level of treating physician opinions , considering the lack of an established, long-term treatment history, and the fact that Ludgate only examined Smith on one occasion at the request of Smith's counsel.  However, after reviewing the relevant medical records, as well as the ALJ's decision, I am of the opinion that the critical inquiry is whether the ALJ improperly substituted her opinion for that of a trained medical professional, i.e., whether she disregarded the psychological opinions expressed by a licensed clinical psychologist and a therapist/counselor at a counseling clinic.

The court recognizes the general rule that, "[i]n the absence of any psychiatric or psychological evidence to support [her] position, the ALJ simply does not possess the competency to substitute [her] views on the severity of the plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).  In this case, other than treatment notes from Smith's treating physicians which contained complaints and diagnoses of depression, anxiety and insomnia, (R. at 330-31, 375-89), the record is devoid of any other evidence relating to Smith's mental impairments outside of the opinions of Ludgate and Haynes.

Smith was treated by Haynes periodically from November 2007 to May 2008. (R. at 360-63, 429.)  Haynes diagnosed Smith with major depression, financial pressures and the inability to work.  (R. at 360-63, 429.)  Haynes also completed an

Assessment Of Ability To Do Work-Related Activities (Mental) in which he concluded that Smith had a poor ability to deal with the public, deal with work stresses, function independently, maintain attention and concentration, understand, remember and carry out detailed and complex job instructions, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 357-58.) Haynes further noted that Smith would miss more than two days of work per month due to his impairments. (R. at 359.)

Ludgate completed a psychological evaluation on April 28, 2008, in which he found that Smith suffered from major depression, a mood disorder due to a medical condition and generalized anxiety disorder. (R. at 397-408.) Ludgate determined that Smith's psychiatric and medical problems precluded him from working. (R. at 403.) He also referenced psychological problems such as a mood disturbance and low frustration tolerance that would make it difficult for Smith to work around other people. (R. at 403.) Ludgate opined that Smith was likely to require continued counseling and psychotropic medication to deal with his mental impairments and problems. (R. at 403.) Ludgate completed an Assessment Of Ability To Do Work-Related Activities (Mental) in May 2008, in which he found that Smith had a poor ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, understand, remember and carry out detailed and complex instructions, behave in an emotionally stable manner and relate predictably in social situations. (R. at 404-07.) Ludgate concluded that Smith would be absent from work more than two days per month. (R. at 407.)

Based upon the relevant psychological evidence of record, it is evident that both Haynes and Ludgate noted very restrictive mental limitations. However, even with this being the only mental-related opinion evidence of record, the ALJ chose to accord little weight to the opinions of Haynes and Ludgate. (R. at 21-22.) The ALJ identified Smith's depression as a severe impairment, (R. at 16), but found that he did not suffer from an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ arrived at a residual functional capacity finding that limited Smith to light work, with certain specific exertional limitations, but, as for additional mental limitations, the ALJ merely limited Smith to routine, repetitive and unskilled work. (R. at 18.)

After a review of the ALJ's written opinion and residual functional capacity finding, the undersigned is of the opinion that the ALJ essentially ignored the findings of both Ludgate and Haynes, as she accorded little weight to each opinion. Both Ludgate and Haynes made very restrictive mental findings, findings that the ALJ did not adopt. Thus, since Ludgate's and Haynes's opinions were the only psychiatric or psychological opinions of record, and the ALJ did not adopt or include such findings, it is obvious that the record does not contain mental-related evidence that supports her opinion. As stated above, when there is no psychiatric or psychological evidence to support the ALJ's decision, the ALJ is not permitted to substitute her opinion for that of a trained medical professional, as an ALJ does not possess the competency to do so. *See Oppenheim*, 495 F.2d at 397.

In this case, Ludgate, a licensed clinical psychologist, certainly constituted a

trained medical professional. Not only did the ALJ substitute her opinion for a trained and licensed clinical psychologist, but she substituted her opinion under circumstances where the trained psychologist's opinion also was supported by evidence of record from a therapist/counselor who treated Smith for certain mental impairments. In this case, instead of disregarding the findings set forth by the only sources who specifically treated and examined Smith's mental limitations, the ALJ would have been best served by ordering a consultative mental evaluation. However, no such evaluation was ordered. Thus, the court is of the opinion that substantial evidence does not support the ALJ's finding with regard to Smith's mental limitations, as she substituted her opinion for that of a trained professional. Accordingly, for the reasons stated above, this case will be remanded to the Commissioner for further evaluation of Smith's mental impairments and limitations. The court notes that Smith's remaining arguments will not be addressed, as the ALJ's error as to Smith's mental limitations necessarily impacted the remaining arguments raised.

## IV. Conclusion

For the foregoing reasons, I will deny the Commissioner's motion for summary judgment. The Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ for further consideration of Smith's mental limitations.

An appropriate order will be entered.

**DATED:**     This 24th day of November 2009.


                                        /s/   *Glen M. Williams*
                                        Senior  United  States  District  Judge